# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with krabza stored at premises controlled by Snap Inc.

)
)
)
)
)
)

Case No. 23-ml-178

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, hereby incorporated by reference

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attached Affidavit in Support of Search Warrant | |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Todd C. Bina
*Applicant's signature*

Todd C. Bina, SSA, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: _____

*Judge's signature*

City and state: _____Washington, D.C._____

Robert B. Collings, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means        ❏ Original                ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  23-ml-178 |
| Information associated with krabza stored at premises | ) | |
| controlled by Snap Inc. | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 14, 2023 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robert B. Collings, U.S. Magistrate Judge _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____

                                                              _____
                                                              *Judge's signature*

City and state:   Washington, D.C. _____        Robert B. Collings, U.S. Magistrate Judge
                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  23-ml-178 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to be Searched**

This warrant applies to information that is associated with the Snapchat account identified by **krabza** and is stored at premises owned, maintained, controlled, or operated by Snap Inc., a company that accepts service of legal process at 2772 Donald Douglas Loop North, Santa Monica, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.**   **Information to be disclosed by Snap Inc. ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government for the account or identifier listed in Attachment A (the "Account"):

a.   For the time period from May 30, 2021 to and including March 27, 2022:  The contents of any available messages or other communication associated with the Account (including, but not limited to snaps, screenshot notifications, chats, videos, Stories, Memories, attachments, draft messages, posts, "friend" requests, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof), and related transactional records for all PROVIDER services used by an Account user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.   For the time period from May 30, 2021 to and including March 27, 2022:  All photographs and videos uploaded by the Account, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photographs and videos;

c.      Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and responses, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, login IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

d.      For the time period from May 30, 2021 to and including March 27, 2022:  All records or other information related to the Account, including address books, contact and "friend" lists; profile information; subscriptions; location settings; and privacy settings;

e.      For the time period from May 30, 2021 to and including March 27, 2022:  All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s); and

2

g.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the service of this warrant, PROVIDER shall deliver the information set forth above via United States mail or courier to:  Special Supervisory Agent Corina Zapata, Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 7848, 935 Pennsylvania Ave., NW, Washington, D.C. 20535-0001, or via e-mail to HQ_ISP_MLAT_Returns@FBI.gov.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Articles 287, 289, 47, and 48 of the Criminal Code of the Netherlands, regarding murder and accessory to murder for the Account information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the crimes under investigation; or (ii) communicated with the Account about matters relating to the crimes under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime(s) under investigation and to the user of the Account;

(d)  All content sent to or from the Account – including any chat, photograph, video, "Story," or "Memory" – relating to any plan and preparations made to gain access to the Victim's residence, and/or to commit offenses, including robbery and/or murder, against the Victim;

(e)  All content sent to or from the Account – including any chat, photograph, video, "Story," or "Memory" – establishing the relationships between MV, MV2, GRV,

4

DM, RMM, and DR, as well as any other conspirators in the offenses, including

robbery and/or murder, committed against the Victim;

(f)  All content sent to or from the Account – including any chat, photograph, video,

"Story," or "Memory" – relating to the movements and location of MV, MV2,

GRV, DM, RMM, and DR, as well as any other conspirators, including those

relating to the warehouse and any other location serving the Suspects as a base for

criminal activity;

(g)  All content sent to or from the Account – including any chat, photograph, video,

"Story," or "Memory" – relating to the Victim and the Victim's residence, and

(h)  All content sent to or from the Account – including any chat, photograph, video,

"Story," or "Memory" – relating to evading detection after the death of the

Victim.

5

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY SNAP INC. PURSUANT TO 18 U.S.C. 2703 AND 3512** | **ML No. 23-ml-178** |

*Reference:  DOJ Ref. # CRM-182-84316; Subject Account: krabza*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Todd C. Bina, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with one account – that is, **krabza** – which is stored at premises controlled by Snap Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which accepts service of process at 2772 Donald Douglas Loop North, Santa Monica, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      The information requested in this search warrant is being sought pursuant to a request for assistance ("Request") from the Ministry of Justice and Security in the Netherlands,

transmitted to Washington, D.C.  Authorities in the Netherlands are investigating MV, GRV, DM, DR, and others. for murder and accessory to murder, in violation of the criminal laws of the Netherlands, specifically, Articles 287, 289, 47, and 48 of the Criminal Code of the Netherlands. A copy of the applicable laws is appended to this application.  This Request is made pursuant to the Agreement comprising the Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty Between the United States of America and the Kingdom of the Netherlands on Mutual Assistance in Criminal Matters signed at the Hague on 12 June 1981, Neth.-U.S., Sept. 29, 2004, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Agreement").  Under the Agreement, the United States is obligated to render assistance in response to the Request.

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2005.  I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit, in Washington, D.C.  My current duties include responding to requests from foreign governments pursuant to mutual legal assistance treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received in response thereto for relevance in compliance with the parameters of the search warrants.  During my employment with the FBI, I have conducted investigations related to numerous criminal and counterterrorism investigations.  I have experience in the execution of search warrants and the analysis of collected evidence.  Additionally, I have received training in the operation of computers and the collection and handling of digital evidence.

4.      The facts set forth in this affidavit are based upon information conveyed to the United States via the Request made pursuant to the Agreement by authorities in the Netherlands

and upon my training and experience.  This affidavit is intended to show merely that there is

sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or

the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I

respectfully submit that there is probable cause to believe that violations of the criminal laws of

the Netherlands have been committed by MV, GRV, DM, RMM, and DR.  There is also

probable cause to search the information described in Attachment A for evidence,

instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      Pursuant to the applicable treaty, this Court has jurisdiction to issue the proposed

Order.  *See* Agreement Annex art.12 (authorizing courts to issue orders necessary to execute the

request).  In addition, this Court has jurisdiction to issue the requested warrant because it is "a

court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(a),

(b)(1)(A) & (c)(1)(A).  Specifically, the Court "is acting on a request for foreign assistance

pursuant to [18 U.S.C.] section 3512 . . . ."  18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C.

§ 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic

communications or for records related thereto, as provided under section 2703"), § 3512(c)(3)

("application for execution of a request from a foreign authority under this section may be filed

. . . in the District of Columbia").

7.      This application to execute the Netherlands's request has been approved and duly

authorized by an appropriate official of the Department of Justice, through the Criminal

Division, Office of International Affairs ("OIA").[1]  *See* 18 U.S.C. § 3512(a).  An OIA attorney has authorized the undersigned to file this application.

## **PROBABLE CAUSE**

### *Background to the Victim's Murder*

8.      On the evening of June 13-14, 2021, an adult male (the "Victim") was murdered in Koggenland.  On June 14, 2021, police received a crime alert and reported to the Victim's home where the Victim was found dead and face down in a pool of blood.  A postmortem examination estimated the Victim's time of death on June 14, 2021 at 03:00 hours.  The Victim died from a gunshot to the chest.

9.      Closed circuit tv ("CCTV") footage captured a vehicle driving away from the scene, and a person walking away from the scene, leading investigators to conclude that there were at least two suspects involved.  Investigators determined the Victim's robbery-turned-homicide had similarities to a robbery that had previously occurred in Haarlem.  The Haarlem robbery suspects were identified as MV, MV2, GRV, DM and RMM (the "Suspects").

10.      Investigators received a tip that MV had also participated in the Victim's robbery. Investigators were familiar with MV because he had a criminal record for embezzlement, theft, handling stolen property, theft from a dwelling, and possession of a firearm.  Investigators believed that MV arranged for vehicles for the Suspects' use in their criminal activity.

---

[1]  The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters.  *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81B and 81C (2018).

11.     Police records also identified MV2, GRV, and DR as MV's associates.  On June 11, 2021, investigators arrested the Suspects, who were together in MV's car, on suspicion of handling stolen property.  Shortly after their arrests, police released the Suspects.

12.     On June 29, 2021, MV2 was found dead in his home, which is discussed in further detail below.  A warrant was issued for MV2's phones.  Subsequently, MV, GRV, DM, RMM, and DR were formally identified as targets in the Victim's murder, which led to the execution of search warrants on their phones and homes.

***Vehicle Used in the Victim's Murder***

13.     Witness 1, a known associate of MV and DR, told authorities that he loaned his car to MV and DR on many occasions, and sometimes Witness 1 received payment from MV and DR for the use of his car.

14.     According to Witness 1, on June 12, 2021, Witness 1 gave his car to MV for MV's use.  Witness 1 also stated that on June 14, 2021, MV returned to Witness 1 in a panic asking for a different car.

15.     When authorities examined DR's mobile phone, they found Witness 1's name and number stored in the phone.  DR's mobile phone also contained WhatsApp chats with MV between June 12-13, 2021.  The content of the chat included the following:

- June 12, 2021 at 15:37 hours, DR texted MV to stay calm as the following day would be an important day;
- June 12, 2021 at 15:38 hours, MV texted DR that the following day, MV would go for a quiet drive with Witness 1 to discuss things.  DR wrote that MV must not tell [Witness 1] anything and just take [Witness 1's] car;
- June 12, 2021 at 19:28 hours, MV texted DR that he took [Witness 1's] car;[2]

---

[2]  DR did not use Witness 1's name throughout the entirety of this WhatsApp chat, however, based on the context of the conversation, Dutch authorities interpreted DR's use of a pronoun and/or other terms to be references to Witness 1.

- June 12, 2021 at 19:34 hours, DR texted MV to call Witness 1 and ask what was in Witness 1's fuel tank;
- June 12, 2021 at 19:35 hours, DR asked MV what type of car it was.  MV wrote that the car was an Astra Sport; and
- June 13, 2021 at 13:28 hours, DR wrote to MV that Witness 1 was taking a shower and would then come.

Witness 1's statement and the above WhatsApp chat led investigators to believe Witness 1's car was used to travel to the Victim's residence on the night of the murder.

16.     Police records identified Witness 1's car as an Opel Astra G CC Sport equipped with a performance exhaust and a 1.8 turbo 259 hp performance engine.  As referenced above, Witness 1's car was referred to as an "Astra Sport" in the WhatsApp chat.  According to investigators, the car's model and features were relevant because on June 13, 2021, CCTV footage at the crime scene recorded sound fragments similar to a loud performance engine on three occasions between 02:33:58 hours and 02:59:21 hours.

17.     On November 9, 2021, the robbery-turned-homicide was featured on a Dutch crime show that requested viewers contact the police if they had any information on the featured crimes.  Two days after the crime show aired, a vehicle with Witness 1's registration plate was taken by the motor vehicle company, "Deals on Wheelz," to a salvage yard in Blooker.  The Netherlands Vehicle Authority confirmed that the registration plate belonged to Witness 1.

### *The Warehouse*

18.     Dutch authorities consider a warehouse under the control of MV to be at the center of the group's criminal activity.  According to investigators, MV used a warehouse in Googwoud that was under investigation in March and October 2020 for stolen vehicles.  In March 2020, as officers approached the warehouse, MV fled in an Audi with fake registration plates.

19.     Police also found documents in MV's name at the warehouse.  The warehouse investigation identified several vehicles registered to "Deals on Wheelz."  According to Dutch Chamber of Commerce records, the relevant "Deals on Wheelz" was also registered to MV's (step)father.[3]  Also, on August 12, 2021, MV's vehicle was found at the warehouse.

### *MV2's Death and Phones*

20.     On June 29, 2021, authorities found MV2 dead in his home with a revolver between his legs.  A postmortem examination concluded that MV2 died from a self-inflicted gunshot to the head.  A forensic examination of the gun identified traces of GRV's DNA. Subsequently, investigators determined that MV2's gun was very likely the same weapon used to kill the Victim.

21.     Investigators examined two mobile phones recovered from MV2.  Both phones contained notes with the Victim's address.  Phone GPS data placed MV2 in the vicinity of the Victim's home on June 6, 7, and 9, 2021.  Based on this GPS data, investigators inferred that MV2 was scouting the Victim's home prior to the robbery/homicide.

22.     Digital records from one of MV2's phones revealed that he called DM, RMM, and MV the afternoon before the robbery/homicide.  There were multiple missed calls between MV and MV2 on June 13, 2021, between 11:43 hours and 15:58 hours.  There was also a one minute and fifty second call at 15:55 hours and a one minute twenty-five second call at 15:58 hours on the same day.

---

[3] Municipal records are unclear if the registrant of the relevant "Deals on Wheelz" is MV's father or stepfather.  Records found during the search of the warehouse and surveillance established that MV resides with the registrant.

23.     MV2's phone data placed MV2 at the warehouse shortly before the Victim's robbery.  MV2's phone contained a Snapchat video of a red Cadillac De Ville recorded on June 14, 2021 at 01:32 hours.  The video's geo coordinates placed MV2 at the warehouse.  The red Cadillac De Ville was registered to "Deals on Wheelz."  On June 14, 2021, according to location data from a different application, MV2 stopped by GRV's residence before proceeding to the warehouse.

### *DM's Phone*

24.     A forensic examination of DM's mobile phone placed him in the vicinity of the warehouse shortly before the robbery/homicide.  On June 14, 2021, six photos were taken with DM's mobile phone between 01:27 and 01:28 hours.  The photos' location data placed DM in the vicinity of the warehouse, and investigators identified the room in the pictures as being the warehouse.  One of the pictures showed DM standing next to a motorbike surrounded by vehicles, car parts, and audio equipment.  A second picture shows DM with GRV.

25.     In addition to the WhatsApp chat discussed above, DR's phone contained a video from June 14, 2021 at 01:29 hours, which was recorded shortly before the robbery-turned-homicide.  The video showed a Scorpion firearm with DR nearby.  Investigators recognized particular features in the video that matched photos taken by officers when inside the warehouse, such as a stereo on top of a closet.

### *MV's Phone and Snapchat Account Showing Activity at the Warehouse*

26.     Investigators identified phone number x74047 as belonging to MV by narrowing the list of phone numbers MV gave authorities in the past, reviewing historical phone records, and using additional technology to confirm the phone number.  The SIM card for the number was used between June 5, 2021 and June 29, 2021 in an Apple iPhone that was found during

MV's arrest and house search.  Between 18:04 hours on June 13, 2021 and 01:23 hours on June 14, 2021, the phone pinged on towers in three different locations.  The last ping was on the cell tower in Nieuwe Niedorp, which covers the area of the warehouse.  Records for GRV's mobile phone show that it pinged the Nieuwe Niedorp tower at the same time.

27.     Dutch authorities examined MV's iPhone and determined that he actively used Snapchat.  MV's account username was identified as **krabza**.  The location feature for **krabza** was turned on, which, according to investigators, means that Snapchat is regularly storing location data.  The **krabza** account also contained videos that were made at the warehouse.  One Snapchat image showed several vehicles at the warehouse.  Another image showed DV in the warehouse with cars in the background while he was pretending to fire a weapon.  An analysis of **krabza**'s location data registered more than 100 visits to the warehouse.

28.     Dutch authorities received limited information from PROVIDER for September 24, 2021 through March 27, 2022.  PROVIDER records confirmed that Snapchat account **krabza** used the location feature during this period.  MV was arrested in connection with the robbery-turned-homicide in March 2022.

29.     As discussed above, Dutch authorities consider the warehouse to be the base of operation for planning the robbery-turned-homicide.  Accordingly, investigators are seeking **krabza** account records relevant to planning, execution, and actions taken to avoid detection, associated with that criminal activity.

## **BACKGROUND CONCERNING PROVIDER'S ACCOUNTS**

30.     PROVIDER is the provider of the internet-based account identified by **krabza**.

31.     PROVIDER owns and operates a free access social networking website that can be accessed at http://www.snapchat.com.  Snapchat is a mobile device application with which

users can take photographs, record short videos, add text and drawings to such photographs or videos, and send these contents to a selected list of recipients.  Photographs and videos sent over the application are known as "snaps."  PROVIDER also enables users to communicate by text in a way similar to an instant-messaging application via chat and video chat features.  Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos.

32.     Users can set a time limit on their snaps that affect how long they may be viewed by the receiver of the snap.  At the end of the viewing time, the snap disappears and the receiving party can no longer view it without use of the Replay feature.  The Replay feature allows a user, once a day, to re-watch a snap received, even though the time limit on the snap may have expired.  Users may use the Replay feature on one snap per day only.

33.     Snapchat users can send text messages to others using the Chat feature.  Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible.  Snapchat, however, does allow users to "save" specific messages, enabling portions of the conversation to be retained.

34.     "Our Stories" is a collection of user-submitted "snaps" from different locations and events.   A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event.  For example, multiple Snapchat users at an event could each contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other.  Users can also view "Our Stories" events, by subscribing to the story, even if they are not actually present at the event.

35.     Snapchat "Our Stories" are collections of Snaps users have submitted to the "Our Stories" feature.  "Our Stories" connected to a specific location may be selected to appear on the

"Snap Map."  The "Snap Map" aggregates stories based on geolocation.  It also allows users to share their locations with friends.  If a user is sharing his or her location on the "Snap Map," it is updated every time the Snapchat application is opened.  A user's specific location will be visible on the "Snap Map" for several hours before it is deleted.

36.     Depending on the user's settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Snapchat service on those device(s).  The general location information may be retained, but it is subject to regular deletion.

37.     In addition to "Our Stories," a Snapchat user can keep a photograph/video diary using the "My Story" feature.  Each snap in "My Story" documents the user's experience.  Based on the user's privacy settings, the photographs and videos added to "My Story" can be viewed either by everyone on Snapchat or by the user's friends only for up to twenty-four hours.

38.     Snapchat also allows users to save sent or unsent "snaps" and posted "Stories," photographs, and videos to "Memories," which is Snapchat's cloud-storage service.  A user can also edit and send Snaps as well as create "Stories" from the saved "Memories."  The "Memories" will be saved by Snapchat until deleted by the user.

39.     Snapchat users may create a list of Friends by which they can identify other Snapchat users for the purposes of sending and receiving information.  Users may search for and add Friends by a number of methods, including username, the user's mobile device address book and other methods allowed by the application.  PROVIDER retains a record of the user's search history, which can be deleted at any time by the user.

40.     While a Snapchat communication may disappear, the record of who sent it and when still exists.  PROVIDER records and retains information that is roughly analogous to the

call detail records maintained by telecommunications companies.  This includes the date, time, sender, and recipient of a Snapchat communication.  Additionally, PROVIDER stores the number of messages exchanged, information concerning which users most communicated with a specific account, and a particular message's status, including if and when the message was opened and whether the receiver used the native screen capture function of his device to take a picture of the snap before it disappeared (screenshot notifications).

  41. PROVIDER asks users to provide basic contact and personal identifying information to include name and date of birth.  When a user creates an account they make a unique Snapchat username.  This is the name visible to other Snapchat users.  Either an e-mail address or a telephone number is required to register a Snapchat account.  If a telephone number is supplied, then it is verified during the registration process.  Snapchat sends an activation code to the telephone number, which must be entered before proceeding with the registration step.  If an e-mail address is supplied, then it is likewise verified.  PROVIDER also retains the account creation date, the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

  42. PROVIDER stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of

devices used in conjunction with the service.  They also collect unique device identifiers such as

the Media Access Control ("MAC") address and the International Mobile Equipment Identifier

("IMEI") or Mobile Equipment Identifier ("MEID") of devices used to access Snapchat.  In the

event the Snapchat user's application crashes, the company also collects a list of other installed

applications on the device to detect any potential software conflicts.

      43.     In my training and experience, in some cases, account users will communicate

directly with an online service provider about issues relating to the account, such as technical

problems, billing inquiries, or complaints from other users.  Providers typically retain records

about such communications, including records of contacts between the user and the provider's

support services, as well as records of any actions taken by the provider or user as a result of the

communications.  In my training and experience, such information may constitute evidence of

the crimes under investigation because the information can be used to identify the account's user

or users.

      44.     As explained herein, information stored in connection with a Snapchat account

may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the investigating officials to establish and prove each

offense-element, or, alternatively, to exclude the innocent from further suspicion.  From my

training and experience, I know that the information stored in connection with a Snapchat

account can indicate who has used or controlled the account.  This "user attribution" evidence is

analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence.  For example, sent and received snaps (and the data associated with the foregoing,

such as date and time) may indicate who used or controlled the account at a relevant time.

Further, information maintained by the online service provider can show how and when the

13

account was accessed or used.  For example, providers typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the criminal activity under investigation.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video uploaded).  Finally, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation.  For example, information in an account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[4]

---

[4]  At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

## <u>REQUEST TO SUBMIT WARRANT BY TELEPHONE</u>
## <u>OR OTHER RELIABLE ELECTRONIC MEANS</u>

45.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of

Criminal Procedure, permission to communicate information to the Court by telephone in

connection with this Application for a Search Warrant.  I submit that OIA Trial Attorney Tracy

M. Johnson, an attorney for the United States, is capable of identifying my voice and telephone

number for the Court.

## **CONCLUSION**

46.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

 /s/ Todd C. Bina

_____

Todd C. Bina
Supervisory Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on


_____

Robert B. Collings
UNITED STATES MAGISTRATE JUDGE

16

## Relevant Provisions of the Dutch Criminal Code

Article 287

A person who intentionally takes the life of another is guilty of manslaughter and liable to a term of imprisonment of not more than fifteen years or a fine of the fifth category.

Article 289

A person who intentionally and with premeditation takes the life of another person is guilty of murder and liable to life imprisonment or a term of imprisonment of not more than thirty years or a fine of the fifth category.

Article 47

1. The following persons are liable as principals:
> (1) those who commit the criminal offense, either personally or jointly with another or others, or who cause an innocent person to commit a criminal offense;
> (2) those who, by means of gifts, promises, abuse of authority, use of violence, threat or deception or providing the opportunity, means or information, intentionally solicit the commission of a crime.

2. With regard to the last category, only those actions intentionally solicited by them and the consequences of such actions are to be taken into consideration.

Article 48

The following persons are liable as accessories to a serious offense:
> (1) those who intentionally assist during the commission of the serious offense;
> (2) those who intentionally provide the opportunity, means or information necessary to commit the serious offense.